## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF SOUTH CAROLINA

| | |
|---|---|
| Jeffrey William Crouchman, | ) CIVIL ACTION NO. 9:16-0426-CMC-BM |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) **REPORT AND RECOMMENDATION** |
| | ) |
| Southern Health Partners, Dr. Sellman, | ) |
| Nurse Denise, Lt. Kristie Leopard, | ) |
| Officer K. Nowaczcki, Officer K. Talley | ) |
| and Officer Zack Durham, | ) |
| | ) |
| Defendants. | ) |
| _____ | ) |

This action was filed by the Plaintiff, pro se, pursuant to 42 U.S.C. § 1983. Plaintiff, who at the time this action was filed was an inmate at the Pickens County Detention Center,[1] alleges violations of his constitutional rights by named Defendants.[2]

The Defendants Durham, Leopard, Nowaczcki, and Talley filed a motion for summary judgment pursuant to Rule 56, Fed.R.Civ.P. on May 23, 2016. As the Plaintiff is proceeding pro se, a Roseboro order was entered by the Court on May 25, 2016, advising Plaintiff of the importance of a dispositive motion and of the need for him to file an adequate response. Plaintiff was specifically advised that if he failed to respond adequately, the Defendants' motion may be granted. Plaintiff thereafter filed a response in opposition to these Defendants' motion for

---

[1]Since the filing of this action, Plaintiff has been released from custody. See Court Docket No. 56 [Change of Address Notice].

[2]Plaintiff originally also asserted some state law negligence claims in his Complaint. However, Plaintiff has dismissed those causes of action. See Court Docket No. 32.



1

summary judgment on July 1, 2016.

Thereafter, on July 14, 2016, the remaining Defendants filed their own motion for summary judgment, and a second Roseboro order was entered on July 15, 2016.  Plaintiff filed his response in opposition to that motion for summary judgment on August 22, 2016.  Defendants Durham, et al., had also earlier filed a reply memorandum on July 15, 2016.

Defendants' motions are now before the Court for disposition.[3]

### Background and Evidence

Plaintiff alleges in his verified Complaint[4] that he was booked into the Pickens County Detention Center in July 2015, and that during his intake process he told the booking officials "of his heart condition, need for special diet, and list of medications, including a prescription for Nitrostat pills for chest pain".  Plaintiff alleges that he was thereafter placed in a protective custody unit, but that after expressing concern to staff about "gang members" in the unit, he was placed in a lock down unit.

Plaintiff alleges that on one occasion (date unspecified) at approximately 5:00 p.m. he asked the Defendant Nurse Denise for a Nitro pill due to chest pain, and that although she said she would bring one back, Plaintiff never received one.  Plaintiff alleges that when he still had not received one by approximately 9:00 p.m., he "had to fuss" to the hall officer, following which "Sergeant Underwood" called Nurse Denise, who said "she had forgotten about Plaintiff".  Plaintiff

---

[3]This case was automatically referred to the undersigned United States Magistrate Judge for all pretrial proceedings pursuant to the provisions of 28 U.S.C. § 636(b)(1)(A) and (B) and Local Rule 73.02(B)(2)(d), D.S.C.  The Defendants have filed motions for summary judgment.  As these are dispositive motions, this Report and Recommendation is entered for review by the Court.

[4]In this Circuit, verified complaints by pro se litigants are considered as affidavits with respect to any factual allegations contained therein that are based on personal knowledge.  Williams v. Griffin, 952 F.2d 820, 823 (4th Cir. 1991).



alleges that thereafter, in August 2015, "right before [he] was released", he had to be treated for a sinus infection. Plaintiff alleges that he was thereafter released from custody.

Plaintiff alleges that he was booked back into the Detention Center on November 12, 2015, at which time he gave Sergeant Underwood "all relevant information about his meds, diet, etc., and still need of Nitro prescription, as well as, an inhaler for treating obstructive lung disease". Plaintiff alleges that he also told Sergeant Underwood during his booking "about his mental health history and diagnosis of bi-polar disorder, PTSD, and his history of psych meds". Plaintiff also alleges that he told "Nurse Lori" all of his relevant medical information during his initial medical interview.  Plaintiff was again placed in the lock down block for medical reasons.

Plaintiff alleges that his meds were delivered to the jail by his treating physician several days later, including "his inhaler, heart meds, Nitro, and anxiety/pain - Neurotin". However, Plaintiff alleges that he had not received any mental health treatment since being at the jail, even though he sent a written request in December to see a mental health person from Pickens Mental Health, which is where Nurse Denise had his records from. Plaintiff also alleges that Nurse Denise told him that he had not been treated by Pickens Mental Health since 2010, but that that was incorrect, that it was 2012 "and that was because he was incarcerated".

Plaintiff further complains that the first three times he received his meds in November he did not receive his inhaler at "med call", while on the third day Nurse Denise did not get his inhaler to him until almost 1:00 p.m. Plaintiff alleges that he is supposed to use his inhaler three times a day per his doctor's prescription, but that Nurse Denise told him "we don't do three times a day". Plaintiff further alleges that his inhaler was forgotten at med call and/or was brought to him late a total of fourteen times in November and December 2015, that on one occasion when he asked Nurse Denise how long it would be before they brought his inhaler she replied "I don't



know how long, I am busy", that on one occasion he did not get his inhaler until 6:00 p.m., and that on another occasion he did not get his inhaler until 9:15 p.m.

Plaintiff also alleges that per his prescription he was supposed to receive his anxiety/pain medication three times a day, but that again Nurse Denise told him "we don't do three times a day". Plaintiff alleges that he would have to take one dose in the morning and then a double dose in the evening, even though that was not appropriate. Further, when his meds ran out Plaintiff alleges he made repeated requests for the "New Horizons Clinic" to be contacted, but that Nurse Denise's answers "were always that 'she can't get anyone on the phone', 'they won't call her back', or 'I can't stay on hold forever'".

Plaintiff alleges that on December 8, 2015 he saw the Defendant Dr. Sellman complaining of "chest pain discomfort", of "scratching sores in scalp", and of generally not feeling well. However, Plaintiff complains that Dr. Sellman gave him only a "very routine cursory examination", and then prescribed him some medicated tar shampoo that he said would have to "come from [Defendant] Lt. Leopard". Plaintiff alleges that he thereafter sent a request for medicated shampoo to Leopard, but that Leopard "never responded". Plaintiff also alleges when he told Dr. Sellman he wanted some Neurotin prescribed, Dr. Sellman told him he would have to have "someone on the outside get it refilled, brought or sent". Plaintiff further complains that Dr. Sellman "denied any pain med".

Plaintif alleges he saw Dr. Sellman again on December 22, 2015, at which time he was complaining of severe neck and shoulder pain, continued discomfort in his chest, and more scalp sores. Plaintiff also complained that he was having problems getting the night shift security officials to give him Nitro pills for his chest pain. Plaintiff alleges that Dr. Sellman again put down in his file for Plaintiff to receive some medicated tar shampoo and to send Lt. Leopard a note/request



4

to provide this shampoo. Plaintiff alleges that Nurse Denise "chimed in" that Lt. Leopard was aware of this request and that it was supposed to be available. Plaintiff complained, however, that the shampoo Nurse Denise was referring to was only "generic dandruff brand" shampoo that Plaintiff alleges was "worthless". Plaintiff alleges he also told Dr. Sellman that he wanted some "coated" aspirin to be taken with his blood thinner due to his having four stents, which Plaintiff again alleges was "per his medical records".

Plaintiff alleges that on December 30, 2015 during a shift change he told the Defendant Officer Talley that he had been having some severe chest pain for "quite some time" and needed a Nitro pill, but that Talley told him he would have to wait on the nurse to come into work (Plaintiff alleges that this was at 5:30 a.m.). Plaintiff alleges that he told Talley there was a prescription bottle of Nitro kept in "Operations" for those occasions when he might need some but that he could not himself get to the intercom to ask for it, but that Talley refused to help him. Plaintiff alleges that he then got another inmate to push the intercom button for him about ten minutes later, at which time the Defendant Officer Nowaczcki "came thru door from Operations with a Nitro". However, Plaintiff alleges that when he asked Nowaczcki to check his blood pressure before giving him the Nitro pill, telling her that his blood pressure was supposed to be taken first, Nowaczcki refused to do so and told him that she used to be a paramedic and that he would fine. Plaintiff also complains that there was no followup by Nurse Denise to check on his condition that morning or by any medical staff.

Plaintiff alleges that on January 4, 2016 he asked Nurse Denise about "pain meds from my outside doctor", and that she had an "attitude response" and walked away. Plaintiff alleges that on January 6, 2016 he again attempted to ask Nurse Denise at med call whether she had been able to contact his outside provider about his pain/anxiety medication refill and also about why he



was not getting coated aspirin, and that Nurse Denise responded that she "can't stay on hold" and that she did not have any coated aspirin.

Plaintiff alleges that on January 10, 2016 he put in a "3rd sick call and dr. request" complaining of a severe earache, headache, sinus infection, and sore throat that Plaintiff alleges he had been suffering from for two and a half weeks. Plaintiff alleges that he saw the sick call nurse (Nurse Candace) in medical that afternoon who gave him an examination. Plaintiff alleges he told Nurse Candace that he had suffered from these ailments for some time and that before he was reincarcerated he was on antibiotics that had been prescribed by "Doctor Li", a physician at New Horizons. Plaintiff alleges that he told Nurse Candace that he was still on those prescribed antibiotics when he came back into the jail on November 12, 2015. Plaintiff also alleges he told Nurse Candace that even though his file indicated that he had last seen the doctor on January 4, 2016, that he had not in fact seen the doctor since December 22, 2015. Plaintiff alleges that Nurse Candace ordered him some Amoxicillin and put him down for a doctor visit.

Plaintiff alleges that he then saw Dr. Sellman on January 11, 2016, who gave him a "very brief exam". Plaintiff alleges that Dr. Sellman told him that he [Dr. Sellman] would not refill his prescription for Neurotin, and that if he wanted this drug he would have to have an outside doctor prescribe it. Plaintiff complains that he was suffering from severe pain, and that even though he is indigent and was entitled to free prescriptions from New Horizons, that his free status had only been good through December and that Nurse Denise had "waited too long to arrange the refill", resulting in it now having to be paid for. Plaintiff alleges that Dr. Sellman only prescribed him Tylenol and a muscle relaxer, which Plaintiff alleges "has not helped at all". Plaintiff then alleges that on January 13, 2016 he did "finally received antibiotics", but complains that it was 100 mg of Amoxicillin and Tylenol.



6

Plaintiff alleges that on January 16, 2016 , "Nurse Lori" forgot his inhaler in the a.m. and then never came back, and that later that day Plaintiff requested Nurse Denise's last name so that he could "file paperwork" about his medical treatment, but that his request was denied. Plaintiff alleges that he then put in another sick call/doctor request on January 17, 2016 about his ongoing conditions and again about needing medicated shampoo because he still had sores in his scalp, but that there was "no response to this 3rd request".

Plaintiff alleges that on January 20, 2016 he had to request a "Nitro" around eleven a.m. because he was having chest pain, and that it was again provided without a blood pressure check. Plaintiff also complains that the Nitro pill was given to him by security, not a nurse, even though he made a verbal request to be seen by medical or a nurse. Plaintiff alleges that when he later spoke to a nurse that evening during med call, "she was not interested in checking blood pressure . . . .".

Plaintiff alleges that on January 21, 2016, at approximately 1:30 a.m., he had the intercom button pushed because he was having severe chest pain after an argument with another inmate. Plaintiff alleges that "Sgt. Callahan" sent two officers to respond, but only after two attempts and five minutes of waiting. Plaintiff alleges that one of these two officers was the Defendant Officer Durham, who checked Plaintiff's blood pressure. Plaintiff alleges that he was then given a Nitro pill ten minutes later, which was five minutes too long. Plaintiff alleges that ten minutes later he asked for another Nitro and was "begging to go to the hospital". Plaintiff alleges that Durham took his blood pressure again (it was 165/95) and he was given another Nitro pill. Plaintiff alleges that he was still having "extremely sharp chest pains one minute apart" and continued to ask to be taken to the hospital, telling Durham that he had been "told months ago by a cardiologist that he needed another heart catheter". Plaintiff was then taken to the emergency



room at approximately 2:15 a.m. by Durham.

Plaintiff alleges he received an examination at the hospital, and that after reviewing his medical history with the ER physician, the doctor stated that he would speak to the jail nurse and doctor about Plaintiff receiving Neurotin. The ER physician also indicated that he would prescribe Plaintiff a long term Nitro, and make a referral to a cardiologist. Plaintiff alleges that the ER doctor also told him he needed to do something about his hypertension, because he was at risk of having another heart attack. Plaintiff alleges that the ER physician told both the Plaintiff and Durham to make sure that the nurse/doctor at the jail gave him a call in the morning to discuss his findings and recommendations.

Plaintiff alleges that at approximately 6:00 a.m. on January 21, 2016 (apparently after he had returned from the ER), he requested a "medical grievance and a sick call request and was denied". Plaintiff alleges that he was "denied or ignored every time he . . . asked for a medical grievance since Nov. 2015". Plaintiff alleges he asked for a sick call request and a grievance again at approximately 7:00 p.m.

Plaintiff alleges that on January 22, 2016 he asked Nurse Denise if anyone had called the ER doctor, but that Denise told him that she had not "had time". Plaintiff alleges that later that same day he asked the "pill call nurse" whether the ER physician had been contacted, and that she "didn't know what she was talking about". Plaintiff alleges that on January 24, 2016 and again on January 25, 2016 he put in sick call/doctor requests, but that these requests were "ignored" and that he did "not get sick call". Plaintiff alleges that on January 26, 2016 Nurse Denise again forgot his inhaler, and that when he asked her about whether she had talked to the ER doctor and why his sick call request had been ignored, she indicated that there was no "follow-up" and again refused to give Plaintiff her last name.



Plaintiff alleges that he again asked for a grievance, and this time he was provided with one. Plaintiff alleges that he turned in a grievance claiming deliberate indifference to his serious medical needs on January 26, 2016, even though (Plaintiff claims) there was some indication that jail officials might take his hospital visits away for asking for a grievance. Plaintiff's complaint is dated three days later, January 29, 2016. Plaintiff seeks injunctive relief, as well as monetary damages against the Defendants for being deliberately indifferent to his serious medical needs in violation of his constitutional rights. See generally, Plaintiff's Complaint.

Plaintiff has attached a brief in support of his claims to his verified Complaint, along with two "declarations". The first "declaration" is from Brandon Cox, who attests that he was Plaintiff's cell mate from December 2015 through February 2016, and that he witnessed Plaintiff make several complaints to officers "about medical and getting a Nitro pill for chest pain", and that Nurse Denise had a "severe attitude". Cox further attests that he witnessed the "incident" involving Nowaczcki giving him a Nitro pill, as well as the incident on January 21, 2016 when there was a "delay in getting him a Nitro and to hospital". Cox further attests that Plaintiff had trouble obtaining grievance forms. See generally, Cox Declaration. The second "declaration" is from Jeremy Kitchens, who attests that he was housed on the same unit with the Plaintiff and witnessed "all the instances in his complaint and verify what he says in his complaint". Kitchens attests that he witnessed Plaintiff "repeatedly ask for medical assistance", "only to be ignored", and that every time he tried to ask Nurse Denise questions she would get a "real nasty attitude and ignored him". Kitchens also attests that he witnessed what Officer Nowaczcki said to Plaintiff about his Nitro pill, and that Sgt. Callahan said she would "take visits" from Plaintiff for filing a grievance. See generally, Kitchens Declaration.

In support of summary judgment in the case the Defendant Denise Pipes has



9

submitted an affidavit in which she attests that she is a licensed practical nurse (LPN) employed by the Defendant Southern Health Partners, Inc. as the Medical Team Administrator at the Pickens County Detention Center. Nurse Pipes attests that her job is to provide care to detainees/patients and to coordinate the medical department. Nurse Pipes attests that her shift at the Detention Center is three to four days a week, that she is also available by phone for any issues that arise when she is not at the Detention Center, and that there are also other nurses who work with the medical department at the Detention Center. Nurse Pipes further attests that the Medical Director for the Detention Center is Dr. Gary Sellman, who provides treatment to the detainees/patients and oversees the nursing care. Nurse Pipe attests that all of these medical personnel are employed by Southern Health Partners. They are not employed by Pickens County or the Detention Center, and have no role in how the Detention Center is run.

Nurse Pipes attests that the Plaintiff was a former detainee at the Detention Center, most recently from November 12, 2015 to March 23, 2016. Nurse Pipes attests that during this approximate four month time period, Plaintiff complained of a variety of medical issues and was provided with care each time in response. Nurse Pipes attests that the care provided included at least six visits with Dr. Sellman, numerous medications provided on a daily basis, blood pressure monitoring, x-rays, a hospital visit, and a cardiology referral. Nurse Pipes further attests that while Plaintiff makes complaints about his Nitrostat pills, his inhaler, Vistatril and Neurontin (a/k/a gabapentin), that these medications were all included in the medications given to the Plaintiff while at the Detention Center, as is reflected in Plaintiff's medical records.

Nurse Pipes attests that, with respect to Plaintiff's complaints about the care he received for his heart condition, and in particular the care he received after going to the hospital on January 21, 2016, that during the night/early morning hours of that day she received a call from an



officer at the jail notifying her that Plaintiff was complaining of chest pain and had taken his Nitrostat tablets. Nurse Pipes attests that because Plaintiff has a heart condition, she advised the officer to transfer him to the hospital to be checked. Nurse Pipes attests that Plaintiff was examined and had tests performed at the hospital, as a result of which the hospital did not admit him and released him back to the jail. Nurse Pipes attests that the medical staff did attempt later that same day to follow up with the hospital, but was unable to reach the ER physician at that time. The Detention Center then faxed an authorization to the hospital (signed by the Plaintiff) requesting that the hospital fax them the records for Plaintiff's visit, and that once those records were received and they saw that the ER physician had prescribed a new medication (Isosorbide Mononitrate), Dr. Sellman was contacted, the medication was ordered, and Plaintiff began receiving this medication as soon as it was received. Nurse Pipes attests that when they were finally able to speak with the ER physician at the hospital on January 26, 2016, he provided additional information and a cardiology referral. Nurse Pipes again attests that all of these facts are also reflected in Plaintiff's medical records.

Nurse Pipes attests that once the ER physician provided the cardiology referral, the medical staff began working to obtain an appointment for the Plaintiff, and that to the best of her recollection the cardiologist scheduled Plaintiff for an appointment around March 1, 2016. Nurse Pipes attests that the medical department cannot control when an outside physician will see a detainee/patient, that they can only request an available appointment, and that once they obtained the appointment for the Plaintiff, they completed the necessary paperwork for the referral, faxed the cardiologist the medical records they had for the Plaintiff, and notified the Detention Center that transport would be required. Nurse Pipes attests that Plaintiff thereafter saw the cardiologist as scheduled.

11



Nurse Pipes attests that the cardiologist recommended Plaintiff have a heart cath and sent an order scheduling Plaintiff for this procedure for March 14, 2016. Nurse Pipes attests that Plaintiff was then transported on the date and time arranged by the cardiologist, but that when the officers arrived at the hospital, the hospital had no record from the cardiologist about the procedure, so the procedure did not go forward at that time. Nurse Pipes attests that as soon as Plaintiff was returned to the Detention Center, the medical staff began trying to reschedule the procedure with the cardiologist, but that Plaintiff was thereafter released from the Detention Center on March 23, 2016, before the procedure could be rescheduled. Again, Nurse Pipes attests that Plaintiff's medical records also confirm all of these facts.

With respect to Plaintiff's complaints about the care he received for sinus pain, ear pain and/or chest/breathing pain while he was at the Detention Center, Nurse Pipes attests that in addition to prescribing several antibiotics (Bactrim, Amoxil, Cipro, and a "z pak"), Cortisporin for his ears, pain relievers, prednisone (a steroid), an inhaler and Claritin, Dr. Sellman also ordered x-rays of Plaintiff's sinuses and chest as a result of his continuing complaints. Nurse Pipes attests that Plaintiff's sinus x-ray revealed resolving sinusitis, while his chest x-ray showed no signs of pneumonia. With respect to Plaintiff's complaint of scalp eczema, Nurse Pipes attests that Dr. Sellman recommended tar shampoo (which is an over the counter medicated shampoo), and that once the medical department received this shampoo, a small container of the shampoo was provided by Nurse Candace to the Plaintiff for him to use. Nurse Pipes attests that when Plaintiff was not satisfied because he wanted the whole bottle, he was advised that this same shampoo was also available at the canteen. Plaintiff was additionally advised that the Claritin he was taking would also help with his itching.

With respect to Plaintiff's complaints about access to his Nitroglycerin (nitrostat)



tablets, Nurse Pipes notes that the medical department at the Detention Center is in a room that is separate from where inmates are housed, and that the medical staff are not permitted to move freely about the Detention Center but must have a security escort.  Nurse Pipes said neither she nor any other medical staff can see or access inmates unless they request to be seen and are either brought to the medical department by an officer, or the medical staff are escorted by an officer to the inmate's cell in the housing area.  Nurse Pipes attests that while they maintain nitrostat tablets in the medical department and provided them to the Plaintiff when they were notified that Plaintiff needed them, that nitrostat tablets were also kept in an area near Plaintiff's cell so that if Plaintiff needed them quickly or after hours when there was no medical staff present, an officer could access them and provide him with one.  Nurse Pipes attests that she therefore may not always have been advised or been aware of when Plaintiff may have requested and taken one of his nitroglycerin tablets, as he himself managed his use of them and could request one when he felt he needed it.  However, if he needed to see a medical staff person or be checked after taking the tablet, he would have to notify the officer, who would then notify the medical department.  Nurse Pipes attests that on the occasions when she or another member of the medical staff were called to Plaintiff's cell or he was brought to the medical department with an issue, they responded and checked Plaintiff's vital signs and tried to address his concerns.  Nurse Pipes further attests that Plaintiff was also on blood pressure checks for the weeks leading up to his cardiology procedure until the time of his release, and was also on blood pressure medications (Metoprolol, Lisinopril), cholesterol medication (Atorvastatin/Lipitor) and a blood thinner (Plavix) throughout the time of his detention at the jail.

        With respect to Plaintiff's complaints about not being seen by a mental health counselor and not receiving his gabapentin, Nurse Pipes attests that when Plaintiff arrived at the Detention Center and reported that he had been receiving mental health treatment prior to his



detainment, the medical department attempted to obtain the records from the provider he identified, but that that provider responded and advised them that Plaintiff had not been a patient there since 2012. As such, although Dr. Sellman ordered that Plaintiff be allowed to finish out the gabapentin (Neurontin) that he had arrived at the jail with, he did not believe it was medically necessary to renew it once that prescription was completed. However, Nurse Pipes attests that after Plaintiff repeatedly complained about not continuing to receive Neurontin, that Dr. Sellman issued him a new prescription for this drug, and that Plaintiff's medical records reflect the administration of this medication. Nurse Pipes further attests that it is important to note that Plaintiff had also been on Vistaril for anxiety during his entire detention, and was also on Moloxicam for pain. Plaintiff had also been placed on the list to see the mental health provider who came to the jail (those appointments being scheduled depending on the severity of need), but that he was released prior to being seen.

In conclusion, Nurse Pipes attests that Dr. Sellman saw the Plaintiff on numerous occasions during the period of his detainment at the detention facility, examined the Plaintiff each time and determined which medications and treatments were medically necessary and appropriate based on Plaintiff's history, presentation and symptomatology, and that the medical staff at the jail then carried out those orders, all as reflected by Plaintiff's medical records which are attached to her affidavit as Exhibit A. Nurse Pipes attests that every person within the medical department, including Dr. Sellman, responded to Plaintiff's needs and provided him with appropriate and responsive medical care, and that although the medical personnel "tried very hard to address his many concerns and issues, . . . he was never satisfied". See generally, Pipes Affidavit, with attached Exhibit (Plaintiff's medical records totaling 141 pages).

The Defendant Kristy Leopard has also provided an affidavit wherein she attests that



she is a Lieutenant at the Pickens County Detention Center, and that in this position she has no authority to approve or disapprove who receives medically related shampoos as ordered by Southern Health Partners medical personnel. Nonetheless, as a result of Plaintiff's request to medical, Lieutenant Leopard attests that she personally purchased and provided some medicated tar shampoo to medical, although she was not responsible for the administration of that shampoo to the Plaintiff. Lieutenant Leopard has attached to her affidavit as an exhibit her receipt for the purchase of that shampoo. Leopard further attests that during Plaintiff's period of detainment he himself spent $133.65 on items from the canteen, and also had $108.08 deposited into his account. Finally, Leopard attests that the Detention Center arranged for Plaintiff to have a heart cauterization procedure and transported Plaintiff to that appointment on March 14, 2016, but that upon his check-in at the hospital, Plaintiff was informed that the hospital scheduler had failed to schedule his procedure and that he would have to reschedule the appointment. Leopard attests that Plaintiff was thereafter released on a personal recognizance bond prior to a new appointment being scheduled. See generally, Leopard Affidavit, with attached Exhibit.

The Defendant Kirk Talley has also submitted an affidavit wherein he attests that he is a correctional officer at the Pickens County Detention Center, and that in the December 2015 time frame he was asked by Plaintiff about his nitroglycerin. Talley attest that as a result of that request, he spoke with Officer Nowaczck, who responded to his request. See generally, Talley Affidavit.

The Defendant Karrie Nowaczck has submitted an affidavit wherein she attests that she is a correctional officer at the Pickens County Detention Center, and that during the time frame set forth in the Complaint Plaintiff requested that she retrieve him a nitroglycerin pill from Operations. Nowaczck attests that she administered the pill and waited with the Plaintiff to make sure the pill did not affect him in any way that would have caused him harm, and that Plaintiff did



not have any side or ill effects from the administration of the nitroglycerin that he had requested. See generally, Nowaczck Affidavit.

The Defendant Zack Durham has submitted an affidavit wherein he attests that he is a correctional officer at the Pickens County Detention Center, and that as a result of Plaintiff's request, he checked Plaintiff's blood pressure, although he does not specifically recall the readings. Durham attests that this was done at the request of Sgt. Callahan, who was receiving instructions from the nurse while he was on the phone with her. Durham attests that all information regarding Plaintiff's blood pressure and the nitroglycerin pill was done in coordination with the instructions of the nurse, and that the decision to take Plaintiff to the hospital was also made at the direction of the nurse. Durham further attests that prior to Plaintiff requesting that his blood pressure be checked, he had been yelling and screaming and had gotten himself into a very agitated state, despite repeated requests for him to calm down. Durham attests that as the officer accompanying Plaintiff to the hospital, he would have received his discharge instructions and given them to Southern Health Partners, and that Plaintiff was discharged from the emergency room without further treatment. See generally, Durham Affidavit.

As an attachment to his response to the jail officials' motion for summary judgment, Plaintiff has submitted a "Declaration". Plaintiff states in this declaration that Talley (in his affidavit) "gives no details of his incident in my Complaint basically says nothing at all". He then summarized what Nowaczck and Durham state in their affidavits, and then states that of his approximately $100 in deposits to his jail account, that almost half was deducted for medical and medications. Plaintiff then states that between December 2015 and March 23, 2016 his inhaler was forgotten "eleven times", and that he also had to take a nitro pill for chest pain "several times" but that no Defendant (medical or nonmedical) ever did a followup blood pressure check. Plaintiff also



states that he was told by all of the nurses and the doctor that all medicated soaps and shampoos had to come from and through Lt. Leopard, but complains that the shampoo he received from Nurse Candace was "Selsun Blue", not tar shampoo. Plaintiff states that on December 30, 2015 he was provided a nitro pill by the Defendant Nowaczck (after Talley did not help him obtain one), but that Nowaczck refused to check his blood pressure even though that is what is called for on the pill bottle. Plaintiff then reiterates his allegations concerning the events of January 2016. See generally, Plaintiff's Declaration.

Plaintiff has also provided another "declaration" from Jeremy Kitchens,[5] in which Kitchens attests that while he was an inmate at the Detention Center he witnessed Nowaczck administer a nitro pill to the Plaintiff under his protest because she refused to check his blood pressure. Kitchens further states in this "declaration" that there are signs in medical stating that all medicated shampoo has to "go thru Lt. Leopard, per her policy". See generally, Kitchens' Declaration.

Finally, as attachments to his response to the medical Defendants' motion for summary judgment, Plaintiff has submitted some copies of medical records consisting of "progress note" entries from February and March 2016. These records reflect calls being placed from the jail to Carolina Cardiology, attempting to reschedule Plaintiff for a heart cath after his initial appointment time had not been properly scheduled. See generally, Plaintiff's Exhibit (Progress notes).

### Discussion

Summary judgment shall be rendered forthwith if the pleadings, depositions, answers

---

[5]This is a different Declaration than the one provided by Kitchens as an attachment to Plaintiff's Complaint.



17

to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.  Rule 56, Fed.R.Civ.P.  The moving party has the burden of proving that judgment on the pleadings is appropriate.  Temkin v. Frederick County Comm'rs, 945 F.2d 716, 718 (4th Cir. 1991).  Once the moving party makes this showing, however, the opposing party must respond to the motion with specific facts showing there is a genuine issue for trial.  Baber v. Hosp. Corp. of Am., 977 F.2d 872, 874-75 (4th Cir. 1992).  Further, while the Federal Court is charged with liberally construing a complaint filed by a pro se litigant to allow the development of a potentially meritorious case, see Cruz v. Beto, 405 U.S. 319 (1972); Haines v. Kerner, 404 U.S. 519 (1972), the requirement of liberal construction does not mean that the Court can ignore a clear failure in the pleadings to allege facts which set forth a Federal claim, nor can the Court assume the existence of a genuine issue of material fact where none exists.  Weller v. Dep't of Social Services, 901 F.2d 387 (4th Cir. 1990).  Here, after careful review of the evidence and arguments provided by the parties, the undersigned concludes for the reasons set forth hereinbelow that the Defendants are entitled to summary judgment in case.

First, since Plaintiff is no longer incarcerated at the Detention Center, to the extent he is seeking injunctive and/or declaratory relief, his claims are moot.  Slade v. Hampton Roads Reg'l Jail, 407 F.3d 243, 248-249 (4th Cir. 2005)[holding that former detainee's request for injunctive relief was moot]; Taggart v. Oklahoma, 74 Fed.Appx. 880, 882 (10th Cir. 2003)[inmate's claims concerning his medical needs against prison officials for injunctive relief were rendered moot by his release]; LaFlame v. Montgomery County Sheriff's Dep't., 3 Fed.Appx. 346 at * * 1 (6th Cir. Jan. 31, 2003)[same].  Plaintiff's claims for monetary damages survive his release from the Detention Center; see Mawhinney v. Henderson, 542 F.2d 1, 2 (2d Cir. 1976); and as public

18



officials, the Defendants are all subject to suit for damages in their individual capacities in a § 1983

lawsuit. Will v. Michigan Dep't of State Police, 491 U.S. 58, 71 (1989); Hafer v. Melo, 112 S.Ct.

358, 365 (1991); Goodmon v. Rockefeller, 947 F.2d 1186, 1187 (4th Cir. 1991).[6] However, for the

reasons set forth hereinbelow, the undersigned finds that Plaintiff has failed to submit evidence

sufficient to create a genuine issue of fact as to whether any named Defendant violated his

constitutional rights such as to subject them to monetary damages in this case.

---

[6]As Southern Health Partners apparently provides medical care to detainees at the Detention Center pursuant to a contract with either the County or the Detention Center itself, it could also possibly be deemed a "public entity" for purposes of a claim under § 1983. Cf. Rhea v. Gerold, No. 09-818, 2009 WL 1346139, at * 3 (D.S.C. May 12, 2009)[Addressing claims against Care Center by using § 1983 analysis]; Munoz v. Providence Hospital, et al., No. 10-1899, 2010 WL 3699883 [same]; Jones v. Correctional Care Solutions, No. 09-269, 2010 WL 2639788 at * 6 (D.S.C. June 7, 2010)[Declining to recommend dismissing Correctional Care Solutions on the basis that it did not act under color of state law], adopted by, 2010 WL 2926178 (D.S.C. July 23, 2010), aff'd, 397 Fed. Appx. 854 (4th Cir. Oct. 6, 2010); Singletary v. Doby, No. 11-2658, at n. 9 (D.S.C. May 23, 2013) [Noting potential for liability of Southern Health Partners for § 1983 claims]; but see Fields v. Southern Health Partners, No. 15-624, 2015 WL 2095781 at * * 1, 3 (D.S.C. May 5, 2015) ["[C]ourts in the district have found that "Southern Health Partners . . . is not an entity subject to suit under § 1983.] (quoting Harrison v. Ross, No. 14-818, 2014 WL 6490182 at * 7 (D.S.C. Nov. 19, 2014) [adopting and incorporating report and recommendation for summary judgment in favor of the defendants]. Individual employees of medical companies providing contract medical care, such as are named as Defendants here, have also been held to be liable under § 1983. Holly v. Scott, 434 F.3d. 287, 292, n. 3 (4th Cir. 2006)[Dismissing Bivens claim against GEO Group, which provided medical care to federal prison inmates at a privately run facility pursuant to a contract with the Federal Bureau of Prisons, but declining to decide whether employees of a private prison facility under contract with a state are subject to liability under 1983]; West v. Atkins, 487 U.S. 42, 48 (1988)[Holding that private physicians that contracted with the State to provide medical care to prisoners were state actors because they were hired to fulfil an obligation - medical care - which was traditionally filled by the State]. However, to the extent Plaintiff's claim can be construed as an attempt to sue the staff of Southern Health Partners, as opposed to specific individuals, medical departments or "medical staff" are not a "person" amenable to suit under § 1983. Harden v. Green, 27 F.Appx. 173, 178 (4th Cir. 2001) [Prison medical department not a person subject to suit under § 1983]; Dalton v. South Carolina Dept. of Corrections, No. 09-260, 2009 WL 823931, at * 2 (D.S.C. Mar. 26, 2009) ["Medical staff" and Prison Health Services entitled to dismissal as they are not persons subject to suit under § 1983.]; Sims v. Medical Staff of Cook County D.O.D., No. 94-1971, 1994 WL 687496 at * 1 (N.D.Ill. Dec. 8, 1994)[the term Medical staff "denotes neither a person nor an entity subject to suit because of the lack of a legal existence . . . the Medical staff will not be a party to this action".].



As a pretrial detainee during the time period set forth in the Complaint, Plaintiff's claim is evaluated under the due process clause of the Fourteenth Amendment, rather than the Eighth Amendment, which is used to evaluate conditions of confinement for those convicted of crimes. Bell v. Wolfish, 441 U.S. 520, 535 (1979). Even so, the underlying standard of whether Plaintiff received constitutionally adequate medical care is essentially the same. See Martin v. Gentile, 849 F.2d 863, 870 (4th Cir. 1988)[Holding that the 14th Amendment guarantees at least 8th Amendment protections]. Under this standard, in order to proceed with his claim for denial of adequate medical care, Plaintiff must have evidence sufficient to create a genuine issue of fact as to whether any named Defendant was deliberately indifferent to his serious medical needs. Estelle v. Gamble, 429 U.S. 97, 106 (1976); Farmer v. Brennen, 511 U.S. 825, 837 (1994); Sosebee v. Murphy, 797 F.2d 179 (4th Cir. 1986); Wester v. Jones, 554 F.2d 1285 (4th Cir. 1977); Russell v. Sheffer, 528 F.2d 318 (4th Cir. 1975); Belcher v. Oliver, 898 F.2d 32 (4th Cir. 1990).

Plaintiff has failed to submit any such evidence. Rather, the evidence before this Court, including not just Plaintiff's medical records but also Plaintiff's own statements in his filings and his exhibits, show that he received continuous and on going treatment for his various medical complaints. He was regularly seen by nurses as well as the medical staff physician, he was prescribed numerous medications and received various tests including x-rays, he was transported to and seen at a hospital emergency room when that was deemed to be necessary, he received a referral to an outside cardiologist who in turn examined and evaluated him, and was even scheduled to have a heart cath procedure performed. None of the medical evidence provided to this Court shows that any named medical Defendant, or indeed any *other* medical personnel, were deliberately indifferent to Plaintiff's serious medical needs. Levy v. State of Ill. Dept. of Corrections, No. 96-4705, 1997 WL 112833 (N.D.Ill. March 11, 1997) ["A defendant acts with deliberate indifference



only if he or she 'knows of and disregards' an excessive risk to inmate health or safety.'"], quoting Farmer, 511 U.S. at 837; House v. New Castle County, 824 F.Supp. 477, 485 (D.Md. 1993) [Plaintiff's conclusory allegations insufficient to maintain claim]. Plaintiff's claims against the non-medical Defendants fail for this same reason. There is no evidence that any of these jail officials failed to provide Plaintiff with care per instructions from medical personnel - they transported him to the emergency room when so instructed, transported him to a cardiologist appointment when so instructed, provided him with a shampoo for his eczema when so instructed (although Plaintiff did like the shampoo he was provided) and was instructed where more was available, and provided him with medications when instructed to by medical personnel. Further, these Defendants were entitled to rely on instructions received from the medical personnel in any event. Cf. Shakka v. Smith, 71 F.3d 162, 167 (4th Cir. 1995) [officials entitled to rely on judgment of medical personnel]; Miltier v. Beorn, 896 F.2d 848, 854 (4th Cir. 1990) [officials entitled to rely on expertise of medical personnel].

Plaintiff's Complaint is quite simply that on occasion he was not seen by medical personnel as quickly as he wanted to be, that on occasion jail staff would not provide him with requested medications (an inhaler or nitro pills) as quickly or as often as he preferred, or did not provide him with a medical inspection (for example, taking his blood pressure) at times when he believed such inspections should have been performed. However, Plaintiff has provided no medical evidence to support his lay opinion that a breach of a recognized duty of care occurred in this case. Green v. Senkowski, 100 Fed.Appx. 45 (2d Cir. 2004) (unpublished opinion) [finding that plaintiff's self-diagnosis without any medical evidence insufficient to defeat summary judgment on deliberate indifference claim]. Even assuming that there were on occasion delays in Plaintiff receiving his inhaler or his nitro pills, or that Plaintiff's blood pressure was not taken when the instructions on his



nitro tablets said it should have been (Plaintiff's claims assumed to be true for purposes of summary judgment), Plaintiff has failed to show that any such delays or omissions in his treatment or examinations amount to a constitutional violation.  Cf. Hill v. Dekalb Regional Youth Detention Center, 40 F.3d 1176, 1188-1189 (11th Cir. 1994)["An inmate who complains that delay in medical treatment rose to a constitutional violation must place verifying medical evidence in the record to establish the detrimental effect of delay in medical treatment to succeed"], overruled in part by Hope v. Pelzer, 536 U.S. 730, 739 n. 9 (2002); Graham v Stansberry, No. 07-3015, 2008 WL 3910689 at * 8 n. 6 (E.D.N.C. Aug. 20, 2008) [Finding that "[e]ven if Plaintiff had alleged a claim based upon [an] alleged delay in receiving heart medication, his claim would be without merit because delay in medical care, with no resulting injury, does not violate the Eighth Amendment.] (citing Stickler v. Waters, 939 F.2d 1375, 1380-1381 (4th Cir. 1993).

         In contrast to Plaintiff's lack of supporting evidence, the evidence before the Court, to include voluminous medical records showing the care and treatment Plaintiff received as well as the sworn affidavit from a licensed medical professional, reflect that the medical professionals involved in Plaintiff's care evaluated Plaintiff's condition and rendered judgment as to the type of care and treatment was warranted based on their professional experience and judgment.  Plaintiff's mere lay disagreement with the opinions or diagnoses of these medical professionals, without any contrary *medical* evidence to show that any medical professional violated the requisite standard of care for his complaints, is not sufficient to maintain a §1983 deliberate indifference lawsuit.  See Wright v. Collins, 766 F.2d 841, 849 (4th Cir. 1985)[Disagreements between an inmate and a physician over the inmate's proper medical care do not state a § 1983 claim absent exceptional circumstances]; Scheckells v. Goord, 423 F.Supp. 2d 342, 348 (S.D.N.Y. 2006) (citing O'Connor v. Pierson, 426 F.3d 187, 202 (2d Cir. 2005) ["Lay people are not qualified to determine...medical



fitness, whether physical or mental; that is what independent medical experts are for."]).  While Plaintiff may not agree with the extent and nature of the medical care he received, he cannot simply allege in a conclusory fashion that he did not receive constitutionally adequate medical care or attention, otherwise provide no supporting evidence, and expect to survive summary judgment, particularly when the Defendants have submitted medical documents and evidence showing that Plaintiff was regularly seen and evaluated by medical personnel for his complaints and which refute Plaintiff's claims.  Green, 100 Fed.Appx. 45 (unpublished opinion) [finding that plaintiff's self-diagnosis without any medical evidence insufficient to defeat summary judgment on deliberate indifference claim]; see also Morgan v. Church's Fried Chicken, 829 F.2d 10, 12 (6th Cir. 1987) ["Even though pro se litigants are held to less stringent pleading standards than attorneys the court is not required to 'accept as true legal conclusions or unwarranted factual inferences.'"]; Levy, No. 96-4705, 1997 WL 112833 ["A defendant acts with deliberate indifference only if he or she 'knows of and disregards' an excessive risk to inmate health or safety.'"].

Of course, Plaintiff could pursue a claim in state court if he believes that the medical care provided to him constituted malpractice, and indeed Plaintiff originally asserted a state law claim of negligence in this lawsuit (since dismissed).  However, that is not the issue before this Court.  See Estelle, 429 U.S. at 106 ["medical malpractice does not become a constitutional violation merely because the victim is a prisoner."].  The only question before this Court is whether the evidence submitted is sufficient to raise a genuine issue of fact as to whether any named Defendant was deliberately indifferent to Plaintiff serious medical needs,[7] the standard for a constitutional

---

[7]Plaintiff does also complain throughout the allegations of his Complaint about the purportedly negative attitudes and occasional comments of certain individual Defendants.  However, as noted hereinabove, the *medical evidence* does not show that any named Defendant was deliberately indifferent to Plaintiff's medical complaints; Levy, No. 96-4705, 1997 WL 112833 ["A (continued...)



claim.  See DeShaney v. Winnebago County Dep't of Social Servs., 489 U.S. 189, 200-203 (1989)

[§ 1983 does not impose liability for violations of duties of care arising under state law]; Baker v.

McClellan, 443 U.S. 137, 146 (1976) [§ 1983 claim does not lie for violation of state law duty of

care]; Estelle, 429 U.S. at 106 ["medical malpractice does not become a constitutional violation

merely because the victim is a prisoner."].  Plaintiff has failed to submit evidence sufficient to meet

this constitutional standard, and therefore his § 1983 claim should be dismissed.

**Conclusion**

Based on the foregoing, it is recommended that the Defendants' motions for summary

judgment be **granted**, and that this case be **dismissed**.

The parties are referred to the Notice Page attached hereto.

_____
Bristow Marchant
United States Magistrate Judge

August 30, 2016
Charleston, South Carolina

_____

[7](...continued)
defendant acts with deliberate indifference only if he or she 'knows of and disregards' an excessive
risk to inmate health or safety.'"]; and that one or more of the named Defendants may have acted
irritated with the Plaintiff or made "cutting" or inappropriate comments is not itself a basis for a §
1983 claim.  Malsh v. Austin, 901 F.Supp. 757 (S.D.N.Y. 1995)["Verbal assault, standing alone, is
not a . . . cognizable injury in a 1983 civil rights action"]; Sluys v. Gribetz, 842 F.Supp. 764, 765 n.1
(S.D.N.Y. 1994), aff'd., Sluys v. Gribetz, 41 F.3d 1503 (2d Cir. 1994); Siglar v. Hightower, 112 F.3d
191, 193 (5th Cir. 1997); Batista v. Rodriguz, 702 F.2d 393, 398 (2nd Cir. 1985); Ajaj v. United States,
479 F.Supp. 2d 501, 538 n. 16 (D.S.C. 2007); Morva v. Johnson, No. 09-515, 2011 WL 3420650 at
* 7 (W.D.Va. Aug. 4, 2011)[Plaintiff failed "to establish that a Defendant violated a constitutional
right by harassing, threatening, or ridiculing him . . . ."]; DePaoa v. Taylor, No. 10-398, 2011 WL
2445859 at * 9 (W.D.Va. June 15, 2011)["[A]n institutional employee's verbal harassment of an
inmate or idle threats made to an inmate, even if they cause an inmate fear, anxiety or discomfort,
do not present a claim of constitutional magnitude."], adopted by, 2011 WL 3105336 (W.D.Va. July
25, 2011), aff'd., 470 Fed. Appx. 186 (4th Cir. Mar. 27, 2012).



**Notice of Right to File Objections to Report and Recommendation**

The parties are advised that they may file specific written objections to this Report and Recommendation with the District Judge. Objections must specifically identify the portions of the Report and Recommendation to which objections are made and the basis for such objections. "[I]n the absence of a timely filed objection, a district court need not conduct a de novo review, but instead must 'only satisfy itself that there is no clear error on the face of the record in order to accept the recommendation.'" *Diamond v. Colonial Life & Acc. Ins. Co.*, 416 F.3d 310 (4th Cir. 2005) (quoting Fed. R. Civ. P. 72 advisory committee's note).

Specific written objections must be filed within fourteen (14) days of the date of service of this Report and Recommendation. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b); *see* Fed. R. Civ. P. 6(a), (d). Filing by mail pursuant to Federal Rule of Civil Procedure 5 may be accomplished by mailing objections to:

Robin L. Blume, Clerk
United States District Court
Post Office Box 835
Charleston, South Carolina 29402

**Failure to timely file specific written objections to this Report and Recommendation will result in waiver of the right to appeal from a judgment of the District Court based upon such Recommendation.** 28 U.S.C. § 636(b)(1); *Thomas v. Arn*, 474 U.S. 140 (1985); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984).

